WESTERN UNION LIFE INSURANCE COMPANY, APPELLANT, V.
THOMAS C. MAYHEW ET AL., APPELLEES.

280 N. W. 250

FILED JUNE 15, 1938.   No. 30298.

*Ginsburg & Ginsburg,* for appellant.

*Lawrence W. Rice, contra.*

Heard before GOSS, C. J., ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ.

ROSE, J.

This is a suit in equity to foreclose on land in Cherry county a mortgage securing a note for $1,000 and interest. The loan was for the term of four years, or until August 30, 1939, with interest payable semiannually, as evidenced by eight coupons, each for $30. Thomas C. Mayhew, defendant, executed the note, mortgage and coupons August 30, 1935. They were payable to Owen McGinty, who, August 30, 1935, assigned them to the Western Union Life Insurance Company, plaintiff. Defendant did not pay interest due March 1, 1936, nor taxes for 1935. Pursuant to terms of

the mortgage, plaintiff, on account of the defaults, declared the entire debt due. The petition is sufficient to support a decree of foreclosure.

Defendant pleaded in his answer that he negotiated with plaintiff and its agents for a 100-dollar loan only; that by fraud, deceit and misrepresentation upon which he relied he was induced by them to sign the instruments described in the petition, when he had no glasses at hand, could not see to read and did not know what he was signing; that the papers were not read to him; that he was not told the principal debt stated in the mortgage was $1,000; that he received no consideration except $100 and $77 paid for taxes. He offered to refund what he had received.

In a reply plaintiff denied all fraud attributed to it in the answer and pleaded it made the purchases in good faith before maturity of the paper, for full value and consideration, without any notice or knowledge of any fraud or other defense of any kind.

Upon a trial of the cause the district court found that defendant had received for the 1,000-dollar mortgage only $125 in cash and $77 in the form of taxes paid for him and that these items with unpaid interest thereon amounted to $225.62. A decree of foreclosure therefor followed. To satisfy the decree defendant deposited with the clerk of the district court $317.55 which plaintiff declined to accept. On appeal by plaintiff, the cause was presented for trial *de novo*.

There was fraud in the inception of the note, mortgage and interest coupons and Owen McGinty, payee named therein, was an active perpetrator thereof. He procured the signature of Thomas C. Mayhew, maker, defendant, to the executed note and the 1,000-dollar mortgage. The maker received a check for $100 and in addition $25 in cash and $77 for taxes. Otherwise, there was no consideration. A formal assignment of the mortgage by McGinty to plaintiff for 67 shares of its capital stock is dated August 30, 1935. The note and interest coupons were indorsed by him to plaintiff without recourse. These facts are clearly shown

by the evidence. The burden, therefore, was on plaintiff to prove that it purchased the unmatured paper in good faith for value without notice or knowledge of fraud or of other defense or infirmity.

The question presented by the appeal is: Did plaintiff prove that it did not participate in the fraud, did not have notice or knowledge of it or of such facts and circumstances as proved bad faith? Comp. St. 1929, secs. 62-402 to 62-406; *Witte v. Broz,* 113 Neb. 168, 202 N. W. 411; *Auld v. Walker,* 107 Neb. 676, 186 N. W. 1008; *People's Trust & Savings Bank v. Rork,* 96 Neb. 415, 148 N. W. 95; *Central Nat. Bank v. Ericson,* 92 Neb. 396, 138 N. W. 563.

Several persons shared the fruits of the fraud. All of them were interested in proving good faith of plaintiff in buying the note and mortgage; in proving want of notice or knowledge of the initial fraud; in proving innocence in all negotiations leading to the transfer from payee to plaintiff and sufficiency of 67 shares of its capital stock as consideration for the assignment of the 1,000-dollar mortgage. In addition to plaintiff the persons interested in cutting off the defense of the defrauded maker of the paper are James W. Bachman, Frank H. Hoagland, Harry H. Haffner and Owen McGinty. McGinty excepted, each testified positively that he had no notice or knowledge of any fraud perpetrated upon Mayhew who signed the tainted instruments. The import of what they said on the witness-stand was that each was entirely ignorant of the fraud and acted in good faith in relation to the transfer of the paper from McGinty to plaintiff. They evinced a purpose to close every conduit through which the taint might reach Bachman or plaintiff. The testimony of each shows on its face bias prompted by self-interest. Accepting as verity, however, direct oral testimony that all who participated in or profited by the transfer, with the exceptions of McGinty and Mayhew, were without any actual knowledge of the preliminary fraud, the issue is not necessarily determined in favor of plaintiff. Evidential facts and circumstances showing bad faith may be more potent than oral testimony of interested persons to

the contrary. The statutes and cases already cited show that bad faith in the taking of fraudulent negotiable notes may be shown by circumstances. Emerson taught:

"Commit a crime, and it seems as if a coat of snow fell on the ground, such as reveals in the woods the track of every partridge and fox and squirrel and mole. You cannot recall the spoken word, you cannot wipe out the foot track, you cannot draw up the ladder, so as to leave no inlet or clew."

The truth in civil cases involving fraud and deceit may be discovered sometimes by the force of circumstances. In the case of *Arnd v. Aylesworth,* 145 Ia. 185, 123 N. W. 1000, the supreme court of Iowa said:

"It is ordinarily to be expected, in these cases, that the purchaser will testify to his good faith and want of notice, and that defendant is compelled to rely upon circumstantial evidence to rebut such showing. Whether plaintiff has sufficiently satisfied the burden resting upon him and made good his claim to be an innocent purchaser is therefore a question for the jury, save in those instances where the testimony is not only consistent with the good faith of such purchase, but is such that no fair-minded person can draw any other inference therefrom. A categorical denial of notice or knowledge is something which in many, if not in most, instances cannot be opposed by direct proof; and the credibility of the witnesses, their interest in the case, the reasonableness or unreasonableness of their statements, the time, place and manner of the transaction, its conformity to or its departure from the ordinary methods of business, and all the other facts and circumstances which, though of slight moment in themselves, yet, when taken together, give character and color to the purchase under inquiry, constitute a showing which the court cannot properly pass upon as a matter of law." Adopted in *Central Nat. Bank v. Ericson,* 92 Neb. 396, 138 N. W. 563, and *Auld v. Walker,* 107 Neb. 676, 186 N. W. 1008.

Bachman was president of plaintiff and was active for several days in negotiating an exchange of insurance com-

pany stock for the note and mortgage. In writing, under date of April 2, 1935, he appointed Hoagland an agent to solicit applications for life insurance and notified him by letter September 9, 1935, that plaintiff was then selling nonparticipating life insurance, inclosing a table showing the commissions of agents. Haffner was also a soliciting agent of plaintiff when the note and mortgage were executed and delivered. These agents of plaintiff officed together in Norfolk, Nebraska, the residence of McGinty and Mayhew. The latter, according to a preponderance of the evidence, was then a feeble man, 84 years of age, who had been childish and unable to work for 15 years. Bachman, Hoagland and Haffner knew that McGinty and Mayhew wanted some money. Plaintiff paid none for the mortgage.

The evidence tends to prove the following facts: Bachman and Hoagland had three conversations in regard to the purchasing of the paper. Hoagland came from Norfolk to the insurance office in Lincoln and told Bachman he had a party who had a 1,000-dollar mortgage to exchange for stock, but mortgagor had to have $300 in money. Hoagland was told to bring the abstract and mortgage and that the exchange would be made if the security proved sufficient, but no cash would be paid. The next conversation occurred about August 18, 1935, when Hoagland returned with a 1,000-dollar mortgage from Mayhew to McGinty and was told it would have to be exchanged for a mortgage in a form adopted by plaintiff and saying McGinty would be willing to take a thousand dollars in stock. The third conversation took place at Lincoln about September 4, 1935. Bachman then had the mortgage in suit, said he would have it recorded and the abstract examined and, if approved by counsel, he would close the deal.

Bachman himself testified that plaintiff issued to McGinty 67 shares of capital stock of the actual value of $10 a share and of the book value of $15 a share. Asked directly how the transaction appeared on the books of accounting, he answered:

"The ledger shows that we received a mortgage for $1,000

and $5 in currency, or $1,005. Now the par value of $500 was set up as capital stock and the balance was set up as contributed surplus."

Notwithstanding what the books thus showed, Bachman testified the par value of the 67 shares was $10 a share and the book value $15 a share. Haffner testified by deposition as a witness for plaintiff, saying in substance on direct and cross-examination: Heard Hoagland tell McGinty stock would be worth $30 in 30 days; heard them talking about procuring the mortgage, Hoagland saying he could sell it, if McGinty could get it from Mayhew; McGinty said he could get a mortgage from the old man who wanted $200 and was told to "go get it if he could, because that would be one way to get his money;" was present when Mayhew signed the mortgage; heard nothing said about how much money Mayhew was to get, except the post-dated check of Haffner himself to Mayhew for $100, bearing on its face "For Final Payment of Mc.," describing the mortgaged land, being then a no-fund check but the one subsequently paid.

Bachman, instead of issuing 67 shares of stock to McGinty in one certificate, issued three certificates, one for 47 shares, another for 10 shares and the third for 10 shares. The certificates bore on their face "Shares $10 each" and were dated September 10, 1935. McGinty gave a separate receipt, witnessed by Haffner, for each certificate. There is evidence that the stock was sent by mail to Hoagland at Norfolk when he and Haffner were authorized soliciting insurance agents of plaintiff officing together. Each of them was active in procuring the mortgage for plaintiff in exchange for stock. Each acquired part of the stock issued to McGinty. Haffner testified he got a portion of the commission which plaintiff paid to Hoagland. It would be taxing credulity too far to find that either was ignorant of the initial fraud under the circumstances.

Bachman, however, testified in effect that neither Hoagland nor Haffner had authority, as agent to solicit applications for insurance, to exchange plaintiff's stock for mort-

gages, and that he and plaintiff had no actual notice or knowledge of McGinty's fraud in procuring from Mayhew the negotiable paper purchased. This oral evidence in the attempt to maintain the burden of proof on the issue of good faith is refuted by the circumstances and by the testimony of Bachman himself. It shows that, after the first mortgage in unsatisfactory form had been presented to him and rejected, he directed Hoagland to get instead a mortgage in the form required by plaintiff, a form which Bachman supplied. This service was performed by Hoagland assisted by Haffner who saw that Mayhew signed the satisfactory form and gave Haffner's own check "For Final Payment of Mc." Bachman testified that plaintiff paid no money for the mortgage except a commission of $150.75 to Hoagland. In addition Hoagland got part of the stock. The truth of the record, therefore, is that Hoagland was an active agent of plaintiff in the procuring of the mortgage in suit and in the transferring of it from McGinty to plaintiff. The following principle of law runs through a long line of decisions:

"A principal who retains benefits derived from the fraudulent conduct of his agent is chargeable with the instrumentalities employed by the latter in carrying out the fraudulent purpose." *Dresher v. Becker,* 88 Neb. 619, 130 N. W. 275. See, also, *McKeighan v. Hopkins,* 19 Neb. 33, 26 N. W. 614; *Joslin v. Miller,* 14 Neb. 91, 15 N. W. 214; *Tylee v. Illinois C. R. Co.,* 97 Neb. 646, 150 N. W. 1015; *Jacobson v. Skinner Packing Co.,* 118 Neb. 711, 226 N. W. 321; *Dickinson v. Lawson,* 125 Neb. 646, 251 N. W. 656.

The circumstances were such as should have prompted Bachman to look into the consideration for the mortgage. He was president of plaintiff, an insurance corporation, and bore to it and its stockholders a fiduciary relation. *Howell v. Poff,* 122 Neb. 793, 241 N. W. 548. His duties required the care and skill essential to that relation and to the business of the insurance company. He knew before he bought the mortgage that both mortgagor and mortgagee wanted money. He refused to offer or pay any money.

Why should a 1,000-dollar first mortgage, accepted as it was at its face value, be exchanged for plaintiff's 67 shares of the recited face value of $10 a share or $670? What prompted mortgagee to make a transfer on such terms? When he could not get in the exchange $200 in money, why should he contribute $500 to the surplus of plaintiff as evidenced by its books? What was wrong with the mortgage? Why was the mortgagee willing to sell it so cheaply? These timely questions propounded themselves in the negotiations and transactions. Ordinary business sense and responsibility directed attention to them. The pertinent legislative and judicial standard of business rectitude is that a transferee of unmatured negotiable paper, purchased by him from the payee who procured it from the maker by fraud without consideration, is not a *bona fide* purchaser, if he had knowledge of such facts and circumstances as proved he took the paper in bad faith, though he testified he had no actual notice or knowledge of the fraud. Comp. St. 1929, sec. 62-406; *Auld v. Walker,* 107 Neb. 676, 186 N. W. 1008.

On a critical examination of all the evidence, the conclusion is that plaintiff did not sustain the burden of proving it purchased the note and mortgage in good faith. The preponderance of the evidence proved bad faith as properly found by the district court.

AFFIRMED.